IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ALLEN R. JORDAN,                    )        CASE NO.  5:17-cv-02466
                                    )
                Plaintiff,          )        MAGISTRATE JUDGE
                                    )        KATHLEEN B. BURKE
        v.                          )
                                    )
COMMISSIONER OF SOCIAL              )
SECURITY,                           )
                                    )        **MEMORANDUM OPINION & ORDER**
                Defendant.          )

Plaintiff Allen R. Jordan aka Allan R. Jordan[1] ("Plaintiff" or "Jordan") seeks judicial

review of the final decision of Defendant Commissioner of Social Security ("Defendant" or

"Commissioner") denying his application for social security disability benefits.  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties. Doc. 13.   For the reasons discussed

below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Jordan protectively filed[2] an application for Disability Insurance Benefits ("DIB") on

March 3, 2014.[3]  Tr. 21, 77, 163-166.  Jordan alleged a disability onset date of February 1, 2005.

---

[1] Plaintiff's first name is spelled "Allen" in the complaint (Doc. 1) and spelled "Allan" in the administrative record (Doc. 11).

[2] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 11/7/2018).

[3] Jordan had previously received social security disability benefits from 1995 until 2000.  Tr. 60-61, 282.  According to Jordan, his benefits were stopped in 2000 by his aunt and grandmother.  Tr. 282, 286.  His aunt, who was his representative at the time, had his benefits stopped because she believed that Jordan was not permitted to work the small job he was working and also receive the benefits he was receiving.  Tr. 282, 286.

Tr. 21, 65, 210.  He alleged disability due to learning disability, depression, and inability to focus.  Tr. 65, 89, 94, 223.  Jordan's applications were denied initially (Tr. 89-91) and upon reconsideration by the state agency (Tr. 94-96).   Thereafter, he requested an administrative hearing.  Tr. 97-100.

On May 10, 2016, Administrative Law Judge Charles Shinn ("ALJ") conducted an administrative hearing.  Tr. 55-64.  At the May 10, 2016, hearing, Jordan appeared without a representative.  Tr. 58-59.  The ALJ explained to Jordan his right to be represented by an attorney or non-attorney representative and his right to request that the hearing be reset in order to allow him the opportunity to find an attorney or non-attorney representative to represent him. Tr. 58-59.   Jordan orally and in writing requested that his hearing be reset.  Tr. 59-60, 140.  In the Acknowledgement of Postponement in Order to Obtain Representation form, Jordan indicated that he understood that he was entitled to have only one postponement to obtain a representative and, if he did not have a representative by the time of the next hearing, he would need to be prepared to proceed with the hearing without a representative.  Tr. 140. Jordan acknowledged that, absent extraordinary circumstances, no further postponement would be granted in order for him to obtain a representative.  Tr. 140.  At the May 10, 2016, hearing, Jordan was provided with a list of organizations that he could contact in an effort to locate representation.  Tr.  63.  The ALJ suggested that Jordan start with contacting legal aid because they handled social security cases and did not take a fee.  Tr. 63.  The ALJ confirmed Jordan's contact information.  Tr. 60.  The ALJ also informed Jordan that the ALJ wanted to obtain an updated psychological medical examination and a physical examination.  Tr. 62-63.  The ALJ explained that Jordan would be contacted about scheduling the examinations and the ALJ confirmed with Jordan that Jordan felt he would be able to find transportation to attend the

consultative examinations.  Tr. 62-63.  The ALJ provided Jordan with the name of his legal assistant as a person for Jordan to contact if he had problems seeking representation or with the medical examinations.  Tr. 64.

A notice of hearing was sent to Jordan on August 24, 2016, notifying him of the hearing that was scheduled for October 4, 2016.  Tr. 141-153.  On September 30, 2016, Jordan contacted the Social Security Administration to advise that he was not going to be able to attend the October 4, 2016, hearing due to transportation problems.  Tr. 154.  Jordan relayed that he had emailed an attorney the day before but had not received a response.  Tr. 154.  The individual with whom Jordan spoke suggested that Jordan call the attorney's office that day and she also stressed to Jordan the importance of Jordan's attendance at the hearing since he had already been granted one postponement.  Tr. 154.  On October 3, 2016, Jordan left a voice mail at the Social Security Administration's offices, indicating that he spoke with an attorney and had an appointment with the attorney on October 7.  Tr. 155.  The attorney had advised Jordan to ask for a postponement.  Tr. 155.  The Social Security Administration employee who memorialized Jordan's message noted that the ALJ did not approve of another postponement and she returned Jordan's message.  Tr. 155.  The individual spoke with Jordan's grandmother who informed the Social Security Administration employee that she had spoken with Jordan the night before and he was planning on attending the hearing the next day.  Tr. 155.  On October 4, 2016, Jordan called the Social Security Administration to confirm he would be attending the hearing.  Tr. 156.

The ALJ conducted the hearing on October 4, 2016.  Tr. 36-54.  Jordan appeared without a representative.  Tr. 38.  During the hearing, Jordan explained he had contacted an attorney and he was scheduled to meet with him that Friday.  Tr. 50.  The ALJ inquired as to what had taken Jordan so long and Jordan indicated he had only recently found a letter the ALJ had sent him and

he wanted to find a good attorney. Tr. 50. Jordan had found the attorney he was planning on meeting with later that week on a website his friend had told him about. Tr. 50. The ALJ continued with the hearing. Tr. 50. At the conclusion of the hearing, Jordan indicated that both of his supervisors at work were going to submit letters regarding his performance at work. Tr. 53. The ALJ informed Jordan that he should get those letters or any other additional evidence as soon as possible. Tr. 53-53. Jordan indicated he would get started on it the next morning. Tr. 54.

The ALJ issued his decision on October 18, 2016. Tr. 18-35. In that decision, the ALJ stated:

> Although informed of the right to representation, the claimant chose to appear and testify without the assistance of an attorney or other representative. He noted that he recently obtained counsel, but such counsel had not submitted necessary documentation to be appointed as the claimant's representative as of the date of the hearing. Because an earlier hearing was already postposed for the purpose of obtained counsel, I determined that it was appropriate to move forward with the hearing. Exhibits 17B through 19B were received subsequent to the second hearing but were considered in reaching the findings herein.[4]

Tr. 21.

The ALJ determined that Jordan had not been under a disability within the meaning of the Social Security Act from February 1, 2005, through the date of the decision. Tr. 22, 30.

Jordan, through counsel, requested review of the ALJ's decision by the Appeals Council. Tr. 161-162, 297-298. On September 28, 2017, the Appeals Council denied Jordan's request for review, making the ALJ's October 18, 2016, decision the final decision of the Commissioner. Tr. 1-7.

---

[4] Included within the noted exhibits was an Attorney-Client Contingent Fee Agreement between Jordan and Attorney Michael A. Liner (Tr. 159) and a Claimant's Appointment of Representative form (Tr. 160). Both were dated October 7, 2016. Tr. 159-160.

## II. Evidence

**A.    Personal, vocational and educational evidence**

Jordan was born in 1974.  Tr. 210.  Jordan lived with his grandmother his entire life.  Tr. 42.  Jordan completed high school.  Tr. 41-42, 224.  At the time of the October 4, 2016, hearing, Jordan was working part-time as a dishwasher at Bob Evans.  Tr. 43.  He had worked there since 2005.  Tr. 43-44.  His duties included washing dishes and performing other assigned cleaning duties such as cleaning the lot outside and cleaning restrooms.  Tr. 44.  Jordan had worked as much as 20 hours per week but his hours had been cut to 7 or 8 hours and then to 3 ½ hours.  Tr. 43, 44.  Jordan indicated that his hours were reduced because he was not performing to his employer's standards.  Tr. 43, 46.

**B.    Medical evidence**

Jordan did not have any mental health medical treatment since 2005, his alleged onset date.  Tr. 61. The medical evidence summarized herein relates to the opinions rendered by the consultative psychological examiners and reviewing psychologists.[5]

**1.    Consultative psychological examiners**

*James M. Lyall, Ph.D.*

On June 16, 2014, consultative examining psychologist James M. Lyall, Ph.D., ABN, FACPN, evaluated Jordan.  Tr. 300-305.  As part of his evaluation, Dr. Lyall conducted WAIS-IV testing.  Tr. 302, 305.

Jordan relayed that he had trouble learning in school and was quite nervous in school and in his adult life.  Tr. 300.  Jordan indicated that he was bullied in school.  Tr. 301.  He reported

---

[5] Opinions were rendered regarding Jordan's physical impairments but he does not challenge the ALJ's findings regarding his physical impairments.  Doc. 15, p. 3.

having trouble completing things in a timely fashion. Tr. 300. As a child, he took Ritalin for ADHD and he felt he still had some attention problems. Tr. 300. Jordan had not had mental health treatment as an adult. Tr. 301. Jordan was raised by and continued to live with his grandmother. Tr. 300. She had been sick more recently and had Parkinson's disease. Tr. 300. A cousin had been living with them for a few months. Tr. 300. Jordan discussed his part-time job at Bob Evans, noting that his managers constantly wrote him up for being "too slow." Tr. 301. Jordan was not certain how much longer he would keep his job. Tr. 301. Jordan indicated that outside of family he had no friends. Tr. 301. He had no hobbies or interests. Tr. 301. He assisted his grandmother with light cleaning. Tr. 301.

Dr. Lyall indicated that the WAIS-IV testing showed that Jordan scored within the low average to upper borderline range in terms of general intellectual indicators. Tr. 302. Jordan's focus and attention skills and processing speed fell more within the lower borderline range, which Dr. Lyall indicated was a profile seen in individuals with ADHD. Tr. 302. Dr. Lyall concluded that Jordan's overall intelligence fell within the borderline range because of his focus and attention problems. Tr. 302. Dr. Lyall diagnosed anxiety disorder, not otherwise specified; ADHD, combined type; and borderline intellectual functioning. Tr. 302. Dr. Lyall noted that Jordan's anxiety and ADHD might improve with mental health treatment. Tr. 302.

In the functional assessment portion of Dr. Lyall's evaluation, Dr. Lyall did not provide specific opinions regarding Jordan's functional limitations. Tr. 303-304. He noted Jordan's borderline range of intelligence; problems with focus and attention and processing speed; nervousness; ADHD; feelings that no one liked him and his tendency to get nervous and frustrated with bosses; and his reported difficulties with work pressure, i.e., feeling pushed to go too fast but he cannot keep up. Tr. 303-304.

*Bruce Malcolm, Psy.D.*

On June 8, 2016, consultative examining psychologist Bruce Malcolm, Psy.D., ABPP, evaluated Jordan. Tr. 308-313. As part of his evaluation, Dr. Malcolm conducted WAIS-IV testing. Tr. 310-311. Dr. Malcolm concluded that the WAIS-IV testing showed that Jordan's IQ was in the borderline range. Tr. 310-311. Dr. Malcolm diagnosed unspecified intellectual disability. Tr. 311. Dr. Malcolm explained that Jordan's working memory and processing speed were factors in his intellectual functioning, noting that Jordan's functioning levels in those two areas was extremely low. Tr. 311. Dr. Malcolm felt that Jordan had good insight into this issue but did not recognize any ability to improve. Tr. 311.

Dr. Malcolm assessed Jordan's functional abilities. Tr. 311-312. In the area of understanding, remembering and carrying out instructions, Dr. Malcolm opined that Jordan had limitations in his ability to process and remember instructions. Tr. 311. In the area of maintaining attention and concentration and in maintaining persistence and pace to perform simple and multi-step tasks, Dr. Malcolm opined that there were limitations in these areas, noting that Jordan relayed that he sometimes lost focus even with routine tasks and his pace had been a constant issue for his employer. Tr. 311. In the area of responding appropriately to supervision and coworkers in a work setting, Dr. Malcolm noted that Jordan relayed that his supervisors frequently confronted him about his pace at work; Jordan indicated he responded appropriately most of the time but inwardly he was frustrated with himself; and Jordan reported no problems with coworkers. Tr. 311-312. Dr. Malcolm opined that Jordan's frustration most likely represented an additional complication with respect to his ability to focus. Tr. 312. In the area of responding to work pressures in a work setting, Dr. Malcolm noted that Jordan reported that

he constantly worried about the pressures of work. Tr. 312. Jordan indicated he normally responded appropriately to the pressures of work but took it home with him. Tr. 312.

On June 22, 2016, Dr. Malcom completed a check-box style Medical Source Statement of Ability to Do Work-Related Activities in which he rated Jordan's ability to understand, remember and carry out instructions and his ability to interact appropriately with supervisors, coworkers, and the public and respond to changes in a work setting. Tr. 316-318. In the area of understanding, remembering and carrying out instructions, Dr. Malcolm found no limitations in Jordan's ability to carry out simple instructions; mild limitations in his ability to make judgments on simple work-related decisions, and moderate limitations in his ability to understand and remember simple instructions, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. Tr. 316. Dr. Malcolm based the stated limitations on Jordan's extremely low working memory and processing speed WAIS-IV scores. Tr. 316. In the area of interacting appropriately with supervisors, coworkers, and the public and responding to changes in a work setting, Dr. Malcolm found no limitations in Jordan's ability to interact appropriately with the public; mild limitations in his ability to interact appropriately with coworkers and in his ability to respond appropriately to usual work situations and to changes in a routine work setting; and moderate limitations in his ability to interact appropriately with supervisors. Tr. 317. Dr. Malcolm based the stated limitations on the previously mentioned working memory and processing speed WAIS-IV scores and Jordan's anxiety and focus on being fired. Tr. 317.

## 2. Reviewing psychologists

On July 9, 2014, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 69-70) and Mental RFC Assessment (Tr. 72-74). In

the PRT, Dr. Tangeman found that Jordan had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of an extended duration. Tr. 70. In the Mental RFC Assessment, Dr. Tangeman opined that Jordan was capable of understanding and remembering simple instructions; sustaining concentration and persisting at simple, routine tasks without strict production requirements or quotas; having occasional, superficial interactions with others; and carrying out tasks in a relatively static environment where changes are readily explained. Tr. 73-74. As additional explanation, Dr. Tangeman stated that Jordan could perform simple work tasks that did not require rapid or consistent pace and had few social demands. Tr. 74.

Upon reconsideration, on October 28, 2014, state agency reviewing psychologist Courtney Zeune, Psy.D., completed a PRT (Tr. 81-82) and Mental RFC Assessment (Tr. 83-85). In the PRT, Dr. Zeune found that Jordan had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of an extended duration. Tr. 82. In the Mental RFC Assessment, Dr. Zeune opined that Jordan was capable of understating and remembering simple one-to-three step instructions; able to complete simple one-to-three tasks in a setting with flexible pace/production quotas but may occasionally require redirection; able to interact with a small group of coworkers for superficial exchanges in a non-public setting with a supervisor who provides constructive feedback rather than criticism; and capable of carrying out tasks in relatively static environments where changes can be readily explained. Tr. 83-85. As additional explanation, like Dr. Tangeman, Dr. Zeune stated that

Jordan could perform simple work tasks that did not require rapid or consistent pace and had few social demands.  Tr. 85.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Jordan testified at the May 10, 2016, and October 4, 2016, hearings.  Tr. 41-50, 60-64. Jordan had received social security disability benefits up until 2000.  Tr. 60-61.  He believed he had been awarded benefits based on his learning disability.  Tr. 61.  Jordan had not had medical treatment since 2005.  Tr. 43, 61.  As a child, Jordan had taken Ritalin for ADHD but he was not currently taking any prescription medications.  Tr. 42-43.

Jordan was working part-time as a dishwasher at Bob Evans.  Tr. 62.  He had worked there since 2005.  Tr. 44.  Over time, his hours had been reduced from a high of 20 hours per week to 3 ½ hours per week.  Tr. 43-45, 62.  Jordan was informed that the most recent reduction in his hours was due to his performance – he was having problems performing to his employer's standards; he could not keep up with the work load.  Tr. 43, 44, 46.  Jordan believes that if it were not for a constant changeover in management, he would have lost his job.  Tr. 45.  After working a shift, physically Jordan feels sore and mentally he feels depressed – he feels that he gives work everything he can but believes that his employer feels he is purposefully slacking. Tr. 46.  Jordan explained he has problems interacting with others at work.  Tr. 45-46.  At times, he feels that coworkers are purposefully trying to start arguments with him.  Tr. 46.  Although he did not think that his employer would ask him to work more hours, if his employer did ask, he thought he might be able to work more hours again.  Tr. 49.

Jordan does not drive and never obtained a driver's license.  Tr. 42, 62.  He rides his bicycle to work.  Tr. 46-47, 63.  When Jordan is not working, he tries to help his grandmother as

much as he can. Tr. 47. His grandmother was 82 years old and unable to do everything around the house because she had Parkinson's. Tr. 47. Jordan's mother comes by their house about four times a week to help them. Tr. 47-48. Jordan's grandmother has a maid to do the cleaning. Tr. 48. During the day, Jordan occasionally plays video games but he mostly watches television. Tr. 48. He is on Facebook daily. Tr. 48. Jordan has a cat. Tr. 48. He rarely goes shopping or out places. Tr. 48. He used to go to football games but no longer does. Tr. 48. Outside of his family, Jordan does not really have friends. Tr. 49.

### 2. Vocational Expert

Vocational Expert ("VE") Alida Coles testified at the October 4, 2016, hearing. Tr. 50-53. Prior to questioning the VE, the ALJ informed Jordan that, if Jordan had questions for the VE, the ALJ would help him as best he could. Tr. 50. When posing his hypothetical question to the VE, the ALJ indicated to the VE that there was no past work for them to discuss. Tr. 52. The ALJ asked the VE to consider a younger individual with a high school education who had no exertional limitations but had the following non-exertional limitations – limited to simple, routine tasks that can be learned in 30 days or less; cannot perform tasks that involve arbitration, negotiation, or confrontation; cannot direct the work of others or be responsible for the safety or welfare of others; cannot perform piece rate work or assembly line work; and is limited to occasional interaction with others. Tr. 52. The VE indicated that there were jobs in the national economy that an individual with the described limitations could perform, including night patrol inspector, campground attendant, and polisher eyeglass frames. Tr. 52-53. The VE provided skill and exertional levels and national job incidence data for each of the identified jobs. Tr. 53.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his October 18, 2016, decision, the ALJ made the following findings:[8]

1.    Jordan meets the insured status requirements of the Social Security Act through December 31, 2020. Tr. 23.

2.    Jordan has not engaged in substantial gainful activity since February 1, 2005, the alleged onset date. Tr. 23.

3.    Jordan has the following severe impairments: borderline intellectual functioning, attention deficit hyperactivity disorder, and anxiety. Tr. 23-24. Jordan's physical impairments are non-severe. Tr. 24.

4.    Jordan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 24-26.

5.    Jordan has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: he is limited to simple routine tasks that can be learned in 30 days or less; he cannot perform tasks that involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others; he cannot

---

[8] The ALJ's findings are summarized.

do piece rate work or assembly line work; and he can occasionally interact with others. Tr. 26-29.

6.     Jordan has no past relevant work. Tr. 29.

7.     Jordan was born in 1974 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 29.

8.     Jordan has at least a high school education and is able to communicate in English. Tr. 29.

9.     Transferability of job skills is not material because Jordan does not have past relevant work. Tr. 29.

10.    Considering Jordan's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Jordan can perform, including night patrol inspector, campground attendant, and polisher of eyeglass frames. Tr. 29-30.

Based on the foregoing, the ALJ determined Jordan had not been under a disability, as defined in the Social Security Act, from February 1, 2005, through the date of the decision. Tr. 30.

## V. Plaintiff's Arguments

Jordan generally argues that reversal and remand is warranted because the record does not support the ALJ's decision that Jordan can perform the work identified by the VE in response to the ALJ's hypothetical on a regular and continuous full-time basis. Doc. 15, pp. 8-17. Jordan contends that his part-time work, which he could only marginally perform, is the same type of work that the ALJ concluded that Jordan could perform on a full-time basis because his part-time job has the same or very similar intellectual/education requirements as the jobs identified by the VE and relied upon by the ALJ to deny benefits. Doc. 15, pp. 9-11. Jordan argues that the ALJ did not fulfill his duty to fully develop the record. Doc. 15, pp. 11-14. Jordan argues that the ALJ's weighing of the medical opinion evidence was faulty and most of the medical opinion evidence supports greater limitations than the ALJ found. Doc. 15, pp. 14-16.

# VI. Law & Analysis

## A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B.     The Court finds no basis upon which to reverse and remand the Commissioner's decision

### 1.     The ALJ satisfied his duty to fully develop the record

Considering Jordan's unrepresented status, he contends that the ALJ erred in his duty to fully develop the record.  The Court finds no error.

An ALJ has an obligation to ensure "that every claimant receives a full and fair hearing . . . [but] the administrative law judge must not become a partisan and assume the role of counsel." *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). An ALJ has a special, heightened duty to develop the record under special circumstances, such as "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with the hearing procedures[.]" *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051-1052). However, "the mere fact that a claimant was unrepresented is not grounds for reversal." *Duncan v. Sec'y of Health & Human Servcs.*, 801 F.2d 847, 856 (6th Cir. 1986). And, "[t]here is no bright line test for determining when the administrative law judge has assumed the role of counsel or failed to fully develop the record." *Lashley*, 708 F.2d at 1052. A court must make the determination on a case-by-case basis. *Id.*.

Even considering Jordan's unrepresented status, a review of the record demonstrates that the ALJ did not err in his duty to develop the record. The ALJ reset the hearing from May 2016 until October 2016 in order to allow Jordan the opportunity to obtain representation. Tr. 62, 141-146. The ALJ provided Jordan with information to assist him in obtaining representation. Tr. 63-64. Although a psychological consultative examination had been completed in 2014 (Tr. 299-306), the ALJ wanted to and did obtain an updated psychological examination and a physical examination (Tr. 62, 308-318, 319-334). In advising Jordan of the need for further examinations, the ALJ made inquiry into Jordan's ability to find transportation in order to attend the examinations. Tr. 62. Once the ALJ obtained the evaluations from the consultative examiners, the ALJ sent those evaluations to Jordan and advised Jordan of the actions he could take relative to the proffered evidence, including providing a written statement concerning the evidence. Tr. 284-285, 290-291. Jordan, demonstrating an understanding of the process and his

rights, provided written statements regarding both evaluations. Tr. 286-289, 292-293. During the hearings, the ALJ inquired about Jordan's medical treatment since the alleged onset date, which was none. Tr. 43, 61. The ALJ asked Jordan questions concerning his part-time position, including the duties associated with the position; Jordan's performance in that part-time position, and his ability to get along with others at work. Tr. 43-47. The ALJ inquired about Jordan's daily activities and social interactions. Tr. 47-49. The ALJ informed Jordan of his right to question the VE and advised Jordan that, if Jordan had questions for the VE, he would assist Jordan as best that he could. Tr. 50. At the conclusion of the VE's testimony, Jordan indicated he had no questions for the VE. Tr. 53. At the conclusion of the hearing, Jordan indicated that he intended to obtain and submit letters from supervisors at work regarding his performance. Tr. 53. The ALJ advised Jordan that he would need to get additional evidence in as soon as possible. Tr. 53. Jordan indicated he would start working on it the following morning. Tr. 53-54.

Considering the foregoing, the Court finds that the ALJ satisfied his duty to fully develop the record. Jordan claims that the ALJ failed to fully develop the record because he did not acknowledge or discuss that jobs identified by the VE in response to the ALJ's hypothetical had the same or similar intellectual/educational requirements as Jordan's part-time work. The ALJ questioned Jordan about the duties of his part-time job. Tr. 44-45. Thus, it cannot be said that the ALJ was unaware of the work that Jordan actually performed at his part-time job. Furthermore, while Jordan frames his argument as an alleged failure to develop the record, the argument is an attack on the ultimate disability determination and, as discussed below, Jordan is unable to show error with that determination. Jordan also claims that the ALJ did not satisfy his duty to fully develop the record because he did not ask the VE hypothetical questions that contained the specific limitations contained in the examining and non-examining psychologists'

opinions. However, as discussed below, an ALJ is not obligated to adopt a medical opinion verbatim.

### 2. The ALJ's decision is supported by substantial evidence

Jordan contends that the ALJ's decision is not supported by substantial evidence because the ALJ did not properly weigh the opinions rendered by the examining psychologists and non-examining psychologists and/or did not incorporate into the RFC all the restrictions contained in those opinions even though the ALJ assigned weight to them. Jordan also argues that the ALJ's determination that Jordan can perform the jobs identified by the VE was unreasonable because the requirements of those jobs are the same or similar to the part-time job that Jordan was able to perform only marginally. The Court finds Jordan's arguments to be without merit.

It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527. *See* 20 C.F.R. § 404.1527(c). Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Id.* However, even when the opinion at issue was rendered by a treating physician, which is not the situation in this case, the ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis of the factors. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ assigned weight to all of the mental health opinions. Tr. 28. More particularly, the ALJ stated:

> As for the opinion evidence, Paul Tangeman, Ph.D., a State Agency psychological consultant, stated that the claimant had moderate limitations in social functioning and maintaining concentration, persistence, or pace (1A/6). Dr. Tangeman stated that the claimant could follow simple instructions and perform simple routine tasks

18

without strict production requirements (lA/8, 9). Dr. Tangeman noted that the claimant could have occasional and superficial interaction with others with no direct influence over others (1A/9). According to Dr. Tangeman, the claimant said that the claimant could carry out tasks in a relatively static environment where changes were readily explained (lA/10). Another consultant generally agreed with Dr. Tangeman, adding that the claimant could interact superficially with coworkers and supervisors in a non-public setting (3A/8).

I give weight to State Agency consultants' assessment. The record shows that the claimant had intellectual deficits and some ongoing anxiety symptoms, but he retained the ability to perform unskilled work. While the claimant had impaired focus, cognition, and intelligence, he displayed coherent thoughts, normal speech, and appropriate behavior.

I give weight to Dr. Lyall's opinion described above. He based his conclusions on the exam findings, which showed that the claimant had trouble concentrating and persisting, but he could perform simple tasks. However, Dr. Lyall's assessment was relatively vague, thus it was of limited usefulness in fashioning the residual functional capacity.

I afford weight to Dr. Malcolm's opinion. His findings were largely consistent with those of Dr. Lyall's. Indeed, the claimant demonstrated the ability to complete simple tasks despite his intellectual, concentration, and frustration problems.

Tr. 28.

As examining and non-examining psychologists, Drs. Lyall, Malcolm, Tangeman and Zeune did not have an ongoing treatment relationship with Jordan and therefore their opinions were not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005). Jordan claims, however, that the ALJ's assessment and weighing of the medical opinions is improperly vague and provides no insight into how the opinions informed his RFC finding because the ALJ gave "weight" to each of the opinions without more specifics or differentiation between the amount of weight assigned to each of the various opinions even though the opinions were not identical. The Court finds that the ALJ's explanation is sufficiently clear to allow meaningful judicial review. Consistent with

the regulations the ALJ detailed each of the opinions and explained his consideration of and findings relative to those opinions. Tr. 28.

Moreover, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). Here, there is no question that the ALJ considered all the relevant evidence in the record. While there was no medical treatment during the relevant period, the ALJ discussed and considered each of the medical opinions.

Furthermore, the ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* And, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence). Furthermore, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion. *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

Considering the foregoing, Jordan's contention that the ALJ's RFC is not supported by substantial evidence because it does not include each and every limitation contained in the medical opinions that were assigned "weight" is unavailing. Additionally, while each and every restriction was not adopted wholesale, Jordan has not shown that the RFC is inconsistent with the opinion evidence.

Jordan also contends that the ALJ's failure to question the VE regarding additional limitations contained in the medical opinions but not included in the RFC was error. The Court disagrees. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). As discussed above, the ALJ did not err in his consideration or weighing of the medical opinion evidence. Further, as non-treating sources, the opinions of the examining and non-examining psychologists were not entitled to controlling weight. And, even though weight was assigned to the various opinions, the ALJ was not obligated to adopt the restrictions from each of the opinions verbatim. Thus, since the VE hypothetical mirrors the RFC and incorporated the limitations that the ALJ accepted as credible, the VE's testimony serves as substantial evidence in support of the ALJ's Step Five finding. Furthermore, Jordan has not shown that reversal and remand is warranted based on his argument that the ALJ unreasonably relied on the VE's testimony because the requirements of the jobs identified by the VE were the same or similar to the part-time job that

Jordan was able to perform only marginally.  As discussed, the VE's testimony was provided in response to a proper hypothetical.  Additionally, the ALJ heard testimony from Jordan regarding his job responsibilities and performance.  It is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: November 9, 2018                    */s/ Kathleen B. Burke*
                                            Kathleen B. Burke
                                            United States Magistrate Judge